## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HM SHAH ALAM,                              *

     Plaintiff,                          *

v.                                        *           Civ. No. DLB-25-1669

ABDUS SALAM MIRDA, *et al.*,              *

     Defendants.                         *

## MEMORANDUM OPINION

HM Shah Alam filed this action against Abdus Salam Mirda, Zakir Hossen Talukder, MD Lavlue Mia, Mohammad Akhand, and Arpit Shah. Alam asserts a variety of state-law claims including breach of contract, fraud, breach of fiduciary duty, and civil conspiracy in connection with his agreement to invest $150,000 in several gas stations owned by the defendants. Mirda, Talukder, Mia, and Shah ("moving defendants") have moved to dismiss the claims against them for lack of personal jurisdiction and for failure to state a claim. For the following reasons, the motion is granted in part and denied in part.

### I.    Background

The following is from Alam's complaint.

Alam resides in Hyattsville, Maryland. ECF 5, at 2. He is originally from Bangladesh. *Id.* He has "no professional experience or training in the sale or evaluation of corporate securities, investing, law, accounting, business management, or business ownership." *Id.* at 5. Mirda resides in Virginia, and Talukder, Mia, Shah, and Akhand reside in Pennsylvania. *Id.* at 3–4. Mirda "is [a] sophisticated business owner and investor who has owned and operated gas stations, including gas stations in West Virginia and Pennsylvania." *Id.* at 5. Between July 2022 and "at least April 13,

2023," Mirda was the "owner and chief executive officer of BD S & T, Inc., a West Virginia corporation." *Id.* at 16.

Alam states that he "and his wife have worked hard throughout their lives" and that "by 2022 they had accumulated about $150,000 as their life savings[.]" *Id.* at 2. That year, "certain other members of the local Bangladeshi community became aware that [Alam] and his family had money available." *Id.*

In August 2022, "Mirda telephoned Alam and offered to [him] a ten percent . . . interest in five . . . gas stations in West Virginia, in exchange for a . . . $150,000 . . . payment[.]" *Id.* at 5. Alam states that Mirda made this proposal "on behalf of himself" as well as Talukder, Mia, and Akhand. *Id.* Mirda "continued contacting" Alam about the proposal "on behalf of himself, . . . Talukder, . . . Mia, and . . . Akhand" "for weeks" after the initial contact. *Id.* at 5–6.[1]

Over the course of these communications, Mirda made several representations to Alam "on behalf of himself," Talukder, Mia, and Akhand. *Id.* at 6. Mirda stated that "the five gas stations were doing well financially" and each brought in "at least $100,000 to $150,000 in gross monthly sales"; that Talukder, Mia, and Akhand "were also co-owners" of the gas stations; that Alam "would receive written documentation of his partial ownership of the five gas stations"; and that Alam "and his wife could be employed by one or more of the gas stations" and "earn $12,000 to $14,000" in monthly wages. *Id.* Mirda promised that if Alam paid him $150,000, he would invest

---

[1] Alam does not explicitly say that he was in Maryland at the time of each of these communications. However, he states that he resides in Hyattsville and that Mirda "engaged in business dealings and agreements with" him "in Hyattsville, Prince George's County, Maryland." ECF 5, at 3. Construing Alam's allegations in the light most favorable to him and drawing all reasonable inferences in favor of jurisdiction, the Court is satisfied that Alam sufficiently alleges that he was in Maryland when Mirda telephoned him and communicated with him regarding the proposal.

it in the gas stations.[2] *Id.* at 8. Mirda also told Alam that he would "personally guarantee[ ] [Alam's] investment" and "would be responsible for any associated loss" that Alam suffered. *Id.* at 6.

On September 24, 2022, Mirda met with Alam at Alam's home in Hyattsville.[3] *Id.* During this meeting, at Mirda's instruction, Alam "personally presented to . . . Mirda [a] personal check . . . in the amount of $100,000 as a first payment toward [Alam's] investment," which Mirda accepted. *Id.* at 6–7. The check was made payable to "BD International Inc.," and the "funds were [subsequently] withdrawn from [Alam's] account." *Id.* at 7. Mia was the owner and CEO of BD International Inc. "from February of 2022 to at least April 13, 2023." *Id.* at 17.

Mirda and Alam met again at Alam's home on October 5, 2022. *Id.* at 7. At this meeting, Alam presented Mirda with a $50,000 check payable to BD S & T Inc. *Id.* This check constituted the "second and final payment toward [Alam's] investment" in the gas station proposal. *Id.* Those funds, too, "were withdrawn from [Alam's] account."[4] *Id.*

---

[2] In his complaint, Alam says generally that the "[d]efendants" promised to invest his money in the gas stations. However, the only defendant who he alleges directly communicated with him regarding the proposal is Mirda. Drawing all reasonable inferences in Alam's favor, Mirda is the person who made this promise.

[3] At one point, Alam says that Mirda traveled to his home on September 24, 2023. ECF 5, at 6. The Court presumes that this is a scrivener's error because, in subsequent paragraphs, Alam states that this meeting occurred on September 24, 2022 and that his $100,000 check was dated September 24, 2022.

[4] In the prefatory section of his complaint, which purports to provide a "[b]ackground and [o]verview" of the defendants' alleged scheme, Alam states that the "[d]efendants met several times with [him] in 2022 and described to him their scheme to buy and operate gas stations" in West Virginia. ECF 5, at 2. However, in the section of his complaint titled "Facts Relevant to the Complaint," the only defendant with whom Alam claims to have met in 2022 is Mirda. Faced with this apparent inconsistency in Alam's allegations, the Court assumes that Alam's claim to have met with the "[d]efendants" in 2022 reflects his view that the defendants were acting in concert— i.e., that by meeting with Mirda, Alam was functionally meeting with all defendants. Bolstering the Court's conclusion is the fact that, in his opposition to the moving defendants' motion, Alam makes no mention of any 2022 meeting(s) between himself and all defendants.

Alam states that he never received any "regular monthly profit distributions" from the gas stations, nor did he and his wife receive any "employment compensation or wages[.]" *Id.* He also "did not reach any stock certificates, receipts, annual reports, or financial statements which would document his $150,000 investment[.]"[5] *Id.*

At some point "[a]fter October of 2022," Alam discovered "that the majority of his $150,000 investment had been divided among the [d]efendants, rather than invested in the" gas stations. *Id.* at 8.

On April 13, 2023, Alam "met with [the] [d]efendants" at an unspecified location "and, at their instruction, received and signed a set of corporate bylaws" for five West Virginia corporations: BD S & S Inc., BD Society Inc., BD International Inc., BD S & T Inc., and BD Unity Inc. *Id.* These bylaws specified that Alam owned a ten percent share in each corporation, and "were prepared by . . . Shah . . . on behalf of himself and" Mirda, Talukder, Mia, and Akhand. *Id.*

On October 28, 2024, Alam, through counsel, informed the defendants that he had not received various corporate records for these five West Virginia corporations, including K-1 forms, 1099 forms, W-2 wage statements, profit and loss statements, time and employment records, and corporate income tax returns. *Id.* On November 18, 2024, Mirda ("on behalf of himself and" Shah, Talukder, Mia, and Akhand), sent Alam "a package containing 2023 [f]ederal and West Virginia K-1 forms for the five West Virginia corporations." *Id.* Alam states that these forms were "incomplete" and "were prepared by . . . Shah on behalf of himself and" Mirda, Talukder, Mia, and Akhand. *Id.* at 9. Alam states that "despite his verbal and written requests, [he] has received . . . no complete state or federal K-1 forms for the five [West] Virginia corporations for 2022, 2023,

---

[5] It is unclear what Alam means by "reach." He may have meant "receive."

or for 2024." *Id.* Nor has he received "copies of state or federal corporate income tax returns" for the five corporations for those years.

On December 6, 2024, Alam, through counsel, requested copies of, or the opportunity to inspect, various corporate records for the five West Virginia corporations, including articles of incorporation and bylaws, written shareholder communications, and meeting minutes for the shareholders and board of directors. *Id.* His request went unacknowledged and unanswered. *Id.* at 10.

As of the date he filed suit, Alam has not been reimbursed for his $150,000 payment, and he has not received any "profit, earnings, interest, or other compensation in excess of" his initial $150,000 payment. *Id.* He also states that he "spent time working for" the defendants, but has not received wages or other compensation. *Id.*

On April 7, 2025, Alam filed suit against the defendants in the Circuit Court for Prince George's County, Maryland, seeking damages in excess of $250,000. He asserts 11 claims: breach of contract (Count I), civil conspiracy (Count II), accounting (Count III), declaratory judgment (Count IV), piercing the corporate veil (Count V), breach of fiduciary duty as to Mirda (Count VI), breach of fiduciary duty as to Mia (Count VII), fraud (Count VIII), unjust enrichment (Count IX), promissory estoppel (Count X), and violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101 *et seq.* ("MCPA") (Count XI).

All defendants removed the action to federal court on May 23, 2025, on the basis of diversity jurisdiction. ECF 1. On July 25, 2025, the moving defendants moved to dismiss the claims against them for lack of personal jurisdiction pursuant to Rule 12(b)(2) or, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6). ECF 14. Alam opposes the motion, ECF 18,

and the moving defendants have filed a reply, ECF 19. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

## II.     Motion to Dismiss for Lack of Personal Jurisdiction

A Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction challenges the propriety of a particular court's exercise of power over a particular defendant.[6] *See Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2020). The inquiry for a Rule 12(b)(2) motion is similar to the inquiry for a Rule 12(b)(6) motion: "[T]he district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019). But there is one significant difference: "[A] court may look beyond the complaint to affidavits and exhibits in order to assure itself of personal jurisdiction." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) (citing *Grayson v. Anderson*, 816 F.3d 262, 269 (4th Cir. 2016)). Throughout, the court must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). Nevertheless, "[w]hen personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a prima facie case of jurisdiction."[7] *Hawkins*, 935 F.3d at 226 (italics omitted).

---

[6] The mere fact that the defendants removed this case to federal court does not mean that they have waived their right to challenge this Court's personal jurisdiction over them. *See, e.g., Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 132 (3d Cir. 2020) ("A party who removes an action from a state to a federal court does not thereby waive any of his or her Federal Rule 12(b) defenses or objections.") (quoting 5C Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1395 (3d ed. 2019)).

[7] In his opposition, Alam requests a hearing on the moving defendants' motion. ECF 18, at 1, 2. Although the court may conduct an evidentiary hearing on a Rule 12(b)(2) motion "[i]f the court

A federal district court may have either general or specific jurisdiction over a nonresident defendant. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003). A court has general jurisdiction over a defendant if the defendant's conduct in the state is not the basis for the suit, *see id.*, and the defendant's connections to the state are "so constant and pervasive as to render it essentially at home in the forum State," *Fidrych*, 952 F.3d at 132 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). By contrast, a court has specific jurisdiction over a nonresident defendant if "the defendant has purposefully availed itself of the privilege of conducting activities in the state," "the plaintiff['s] claims arise out of those activities directed at the state," and "the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Carefirst*, 334 F.3d at 397.

Alam does not allege that any of the moving defendants has "constant and pervasive" connections to Maryland that would establish general jurisdiction. *See Fidrych*, 952 F.3d at 132 (quoting *Bauman*, 571 U.S. at 122). Alam, then, must establish that this Court has specific jurisdiction over the moving defendants. Specific jurisdiction exists if, but only if, "(1) the exercise of jurisdiction . . . [is] authorized under the state's long-arm statute; and (2) the exercise of jurisdiction . . . comport[s] with the due process requirements of the Fourteenth Amendment." *Carefirst*, 334 F.3d at 396.

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *See* Fed. R. Civ. P. 4(k)(1)(A); *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 622

---

deems it necessary and appropriate, or if the parties so request," it need not hold a hearing "when doing so would ultimately serve no meaningful purpose." *Grayson*, 816 F.3d at 268–69. One such purpose is to resolve factual disputes relating to jurisdiction. *See, e.g., Moreno v. TitleMax of Va., Inc.*, 735 F. Supp. 3d 645, 654 (M.D.N.C. 2024). Here, Alam does not identify any disputed facts relevant to the jurisdictional issue that need to be resolved or otherwise explain why a hearing is warranted. The Court denies Alam's request for a hearing and will resolve the motion on the papers.

(4th Cir. 1997). Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b), reaches as far as the Due Process Clause permits. *See Carefirst*, 334 F.3d at 396 (citing *Mohamed v. Michael*, 370 A.2d 551, 553 (Md. 1977)). Even so, courts cannot combine their analyses of the long-arm statute and the Due Process Clause. *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n.6 (Md. 2006). Rather, they first must apply the long-arm statute to the facts to determine whether the "defendant's activities are covered by the statutory language." *Dring v. Sullivan*, 423 F. Supp. 2d 540, 545 (D. Md. 2006) (quoting *Joesph M. Coleman & Assocs., Ltd. v. Colonial Metals*, 887 F. Supp. 116, 118 n.2 (D. Md. 1995)). After an analysis of the long-arm statute, courts then analyze whether the exercise of personal jurisdiction over a nonresident defendant accords with due process. *See Carefirst*, 334 F.3d at 397.

Maryland's long-arm statute limits specific jurisdiction to cases where the cause of action "aris[es] from any act enumerated in" the statute itself. Cts. & Jud. Proc. § 6-103(a). The statute authorizes jurisdiction over a party who, "directly or by an agent," acts in one of six ways:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply goods, food, services, or manufactured products in the State;

(3) Causes tortious injury in the State by an act or omission in the State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;

(5) Has an interest in, uses, or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*Id.* § 6-103(b).

### A. Personal Jurisdiction Over Mirda

The moving defendants contend that this Court cannot exercise personal jurisdiction over any of them because, "[a]t best, the [c]omplaint could be construed as alleging that . . . Mirda participated in a single phone call while he was located outside of the state to [Alam] while located in Maryland." ECF 14-1, at 14. As to Mirda, the Court disagrees.

Alam's allegations are sufficient to show that Mirda falls under subsection (b)(1) of the long-arm statute, which applies to nonresident defendants who "[t]ransact[ ] any business or perform[ ] any character of work or service in the State."[8] For purposes of this subsection, in a breach of contract suit "[w]here [a defendant's alleged] contacts [with Maryland] involve a contract," the court may "assert jurisdiction over a party to a contract . . . if the party has performed purposeful acts in Maryland in relation to the contract, albeit preliminary or subsequent to its execution." *Orbita Telecom SAC v. Juvare LLC*, 606 F. Supp. 3d 240, 248 (D. Md. 2022) (quoting *Du-Al Corp. v. Rudolph Beaver, Inc.*, 540 F.2d 1230, 1232 (4th Cir. 1976)). For subsection (b)(1) to apply, a defendant need not "ever be physically present in the state," *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 766 (D. Md. 2009), "as long as his or her actions culminate in 'purposeful activity' within [Maryland]," *Sleph v. Radtke*, 545 A.2d 111, 115 (Md. Ct. Spec. App. 1988) (quoting *Mohamed*, 370 A.2d at 554). "An essential factor in determining whether business transactions give rise to specific jurisdiction is whether the defendant initiated the contact." *Orbita Telecom*, 606 F. Supp. 3d at 248.

In this suit for, among other claims, breach of contract, Alam—who lives in Maryland—alleges that Mirda initiated contact and sought a business relationship with him by telephoning

---

[8] Because the Court concludes that subsection (b)(1) applies to Mirda, it does not consider whether any other subsections of the long-arm statute apply to him.

him to offer him a ten percent share in five West Virginia gas stations in exchange for $150,000. Far from a one-off communication, Alam alleges that Mirda repeatedly contacted him in Maryland to discuss this proposal over a period of several weeks—all the while making various representations and promises to persuade him to invest—culminating in Mirda twice traveling to Alam's Hyattsville home to accept payment under their agreement. These allegations, taken as true, suffice to show that Mirda "transacted business" in Maryland under subsection (b)(1). *See, e.g.*, *CoStar*, 604 F. Supp. 2d at 766 (personal jurisdiction was proper over out-of-state defendant under subsection (b)(1) where defendant "initiated the contact with [the] [p]laintiffs and participated in transactions" such as "enter[ing] into a licensing agreement, send[ing] transmissions via e-mail, contact[ing] [the] [p]laintiffs by phone, and repeatedly access[ing]" the plaintiffs' servers in Maryland); *Jason Pharms., Inc. v. Jianas Bros. Packaging Co.*, 617 A.2d 1125, 1129 (Md. Ct. Spec. App. 1993) (out-of-state corporate defendant transacted business in Maryland within the meaning of subsection (b)(1) when it "initiated negotiations over the sale" at issue "by calling [the plaintiff] in Maryland . . .; engaged in several weeks of negotiations with the [plaintiff], which was at all pertinent times located in Maryland; entered into a . . . contract, whether valid or invalid, with [the plaintiff] in Maryland; and sent a down payment of $35,000 into Maryland").

The Court next considers whether the exercise of personal jurisdiction over Mirda would comport with due process. In conducting the due process inquiry, the court must "consider[ ] (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *CoStar*, 604 F. Supp. 2d at 766. "Phrased another way, the exercise of specific

jurisdiction is consistent with the requirements of due process if 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Johansson Corp. v. Bowness Constr. Co.*, 304 F. Supp. 2d 701, 704 (D. Md. 2004) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Where the case involves a contract, "the court must perform an individualized and pragmatic inquiry" that considers, among other things, "where the parties contemplated that the work would be performed, where negotiations were conducted, . . . where payment was made" and "whether the defendant initiated the business relationship in some way." *Coastal Lab'ys, Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1018–19 (D. Md. 2020) (quoting *Johansson*, 304 F. Supp. 2d at 705).

As to the first prong of the due process analysis—whether the defendant "purposefully availed [himself] of the privilege of conducting activities in" Maryland, *CoStar*, 604 F. Supp. 2d at 766—the court considers a wide range of factors, including:

> [1] whether the defendant maintains offices or agents in the forum state; [2] whether the defendant owns property in the forum state; [3] whether the defendant reached into the forum state to solicit or initiate business; [4] whether the defendant deliberately engaged in significant or long-term business activities in the forum state; [5] whether the parties contractually agreed that the law of the forum state would govern disputes; [6] whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; [7] the nature, quality and extent of the parties' communications about the business being transacted; and [8] whether the performance of the contractual duties was to occur in the forum.

*CSS Antenna, Inc. v. Amphenol-Tuchel Elecs., GmbH*, 764 F. Supp. 2d 745, 749 (D. Md. 2011) (alterations in *CSS Antenna*) (quoting *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)). "[W]hether the defendant initiated contact" is particularly "essential" "in determining whether business negotiations give rise to specific jurisdiction[.]" *Id.* (quoting *CoStar*, 604 F. Supp. 2d at 766); *see also dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 133 (4th Cir. 2023) ("Our court 'place[s] special importance on the fact that the defendant initiated contact with

the plaintiff in the forum state.'") (alteration in *dmarcian*) (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 200 (4th Cir. 2018)).

Here, several of these factors do not apply. Alam does not, for instance, allege that Mirda owns any property in Maryland or that he and Mirda agreed that Maryland law would govern the resolution of their disputes regarding their agreement. Crucially, however, Alam alleges that Mirda initiated contact with him in Maryland, reaching out to him to propose that he make a substantial investment in Mirda's and the other defendants' gas stations and repeatedly following up over the ensuing weeks. Moreover, Alam alleges that Mirda traveled to his Hyattsville home on two separate occasions to accept payment. These allegations suffice to show that Mirda purposefully availed himself of the privilege of conducting activities in Maryland.

The second prong of the due process analysis—"whether the plaintiff's claims arise out of [the defendant's] activities directed at" Maryland, *CoStar*, 604 F. Supp. 2d at 766—is satisfied when a defendant's business transactions related to the forum state are "the genesis of [the] dispute," *CFA Inst. v. Inst. of Chartered Fin. Analysts*, 551 F.3d 285, 295 (4th Cir. 2009), and "form[ ] a central part of [the plaintiff's] claims," *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 306 (4th Cir 2012). Here, but for Mirda's business activity directed at Maryland—his outreach to Alam and his travel to Maryland to accept payment—Alam would not have made and lost the $150,000 payment on which this suit is predicated. Mirda's contact with Maryland is integral to Alam's claims. Alam's claims thus "arise out of" Mirda's activity related to Maryland.

Finally, the third prong of the analysis—"whether the exercise of personal jurisdiction would be constitutionally 'reasonable,'" *CoStar*, 604 F. Supp. 2d at 766—requires the court to assess "the burden on [the defendant], the interests of [Maryland] as the forum state, and the

[plaintiff's] interests in obtaining relief," *CFA Inst.*, 551 F.3d at 296. "Although constitutional reasonableness is a somewhat nebulous concept," this prong "is designed to ensure that jurisdictional rules are not exploited 'in such a way as to make litigation so gravely difficult and inconvenient that a party unfairly is at a severe disadvantage in comparison to his opponent.'" *Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan*, 259 F.3d 209, 217 (4th Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). Any burden to Mirda from litigating in this forum appears to be minimal. He has been able to secure counsel in Washington, D.C.—a short drive or Metro ride from the courthouse in Greenbelt—and should have foreseen that he could be haled into court in Maryland by virtue of his business transactions in the state. *See, e.g.*, *Tire Eng'g & Distrib.*, 682 F.3d at 303 (a defendant's "ability to secure counsel in the forum state and its choice to do business with a forum resident . . . counsel[s] that defending the suit would not be particularly burdensome"). Maryland also has a strong interest in having Alam's claims resolved, since Alam is a Maryland resident and most of his claims arise under Maryland law. *See id.* at 305 ("Virginia has a particular interest in this dispute because some of the claims are based on the state's law."); *see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 368 (2021) (explaining that states have "significant interests" in "providing [their] residents with a convenient forum for redressing injuries inflicted by out-of-state actors") (alteration in *Ford*) (quoting *Burger King*, 471 U.S. at 473). And Alam—who seeks redress for what he alleges to be the wrongful loss of his life savings—clearly has a strong interest in obtaining relief. *See, e.g.*, *Cox v. Ritz-Carlton Hotel Co. of Mex., S.A. DE C.V.*, No. RDB-05-2556, 2006 WL 3313773, at *4 (D. Md. Nov. 9, 2006) (fact that plaintiff "suffered significant injuries as a result of [her] fall" supported conclusion that she had "a strong interest in obtaining relief"). Therefore, the exercise of personal jurisdiction over Mirda would be constitutionally reasonable.

The Court has personal jurisdiction over Mirda.

**B. Personal Jurisdiction Over Talukder, Mia, and Shah**

The Court does not, however, have personal jurisdiction over Talukder, Mia, and Shah.

Alam does not allege that Talukder, Mia, and Shah have personally engaged in any activity that would bring them within the ambit of Maryland's long-arm statute. He does not allege that they have "[t]ransact[ed] any business or perform[ed] any character of work or service" in Maryland (unlike Mirda); that they have "[c]ontract[ed] to supply goods, food, services, or manufactured products in" Maryland; that they have themselves engaged in any "act or omission" in Maryland that caused him an injury; that they "regularly do[ ] or solicit[ ] business, engage[ ] in any other persistent course of conduct . . . or derive[ ] substantial revenue from goods, food, services, or manufactured products used or consumed in" Maryland; that they use, possess, or have an interest in any real property in Maryland; or that they have "[c]ontract[ed] to insure or act as surety" in any respect. *See* Cts. & Jud. Proc. § 6-103(b).[9] Because Alam does not allege that these three defendants fall within Maryland's long-arm statute, it would appear that this Court does not have specific jurisdiction over them. Alam insists, however, that this Court can exercise personal jurisdiction over Talukder, Mia, and Shah under the so-called "conspiracy theory of jurisdiction."

In certain, limited circumstances, one nonresident defendant's actions in Maryland can establish personal jurisdiction over other nonresident defendants under "an agency-based 'conspiracy theory of jurisdiction[.]'" *Dominion Fin. Servs., LLC v. Pavlovsky*, 673 F. Supp. 3d 727, 743 (D. Md. 2023) (quoting *Mackey*, 892 A.2d at 486). To establish personal jurisdiction over

---

[9] Indeed, in his opposition, Alam "concedes that . . . Mirda was the only [d]efendant physically present in Prince George's County, Maryland, at times relevant to the [c]omplaint." ECF 18-1, at 4.

nonresident defendants with "no direct contacts with the forum" based on "overt acts in furtherance of [a] conspiracy" and "attributable to . . . co-conspirators," the plaintiff must show that

> (1) two or more individuals conspire[d] to do something (2) that they could reasonably expect to lead to consequences in a particular forum, . . . and [3] those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state . . . .

*Id.* at 743–44 (quoting *Mackey*, 892 A.2d at 486). If these circumstances are present, then "'one co-conspirator is acting as the agent of the others,' and the other co-conspirators are thus liable for any acts 'done by an agent within the meaning of § 6-103(b) of the Maryland long-arm statute.'" *Id.* at 744 (quoting *Mackey*, 892 A.2d at 486). The Fourth Circuit recently emphasized that a plaintiff who seeks to make a prima facie showing of personal jurisdiction under a conspiracy theory must "'plead with particularity' concrete facts supporting the existence of a conspiracy" and cannot predicate jurisdiction on mere "naked assertion[s] of conspiracy" among the defendants. *Mobilization Funding, LLC v. Stokes*, 163 F.4th 55, 63 (4th Cir. 2025) (quoting *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "[I]f the facts alleged 'could equally describe arms-length transactions' between the purported co-conspirators, then the party asserting jurisdiction has not met its burden." *Id.* (quoting *Unspam*, 716 F.3d at 330). And Maryland's highest court has held that "jurisdiction may be imputed to a co-conspirator 'only if [he] reasonably expects *at the time [he] agreed to participate in the conspiracy* that such acts will be done and that such acts will subject the co-conspirator who performs them to the personal jurisdiction of the forum state.'" *Dominion*, 673 F. Supp. 3d at 744 (alterations in *Dominion*) (quoting *Mackey*, 892 A.2d at 489) (emphasis in *Mackey*).

Alam's allegations of a conspiracy among the moving defendants toe the line between conceivable and plausible. Many of his allegations—that he met with the defendants to sign

15

bylaws, for example, or that Shah prepared those bylaws and K-1 forms "on behalf of" the other defendants—"could 'equally' reflect 'arms-length transactions . . . in the ordinary course of business,' rather than any kind of illicit conduct." *Stokes*, 163 F.4th at 63 (alteration in *Stokes*) (quoting *Unspam*, 716 F.3d at 330). And although Alam asserts throughout his complaint that Mirda, in soliciting his payment, acted "on behalf of" the other defendants, he provides almost no facts to substantiate this assertion. He does not allege (for example) that the other moving defendants were ever involved in his and Mirda's discussions; that the moving defendants ever instructed Mirda to contact him and solicit payment; or that Mirda ever told him that he was acting as the moving defendants' agent.

Nevertheless, Alam has alleged at least two specific facts that (just) make it plausible that the moving defendants were involved in a conspiracy to defraud him of his money. First, he alleges that Mirda instructed him to make his first $100,000 check payable to BD International, Inc.—a company of which Mia was owner and CEO. Second, Alam alleges that Mirda and the other moving defendants (as well as Akhand) divided his $150,000 payment among themselves. These allegations, taken together, plausibly suggest that when Mirda solicited Alam's money he was acting not as a free agent but at the other moving defendants' behest and that the moving defendants had agreed among themselves to use Alam's investment to line their pockets.

Alam still fails, however, to establish personal jurisdiction over Talukder, Mia, and Shah under the conspiracy theory of jurisdiction. Alam does not allege that a reasonable person in Talukder, Mia, and Shah's shoes would have expected, at the time they entered the conspiracy, that Mirda would perform any activity in furtherance of the conspiracy that would subject him to personal jurisdiction in Maryland. Alam does not clearly specify when the moving defendants allegedly formed their agreement, nor does he allege that Talukder, Mia, and Shah anticipated or

knew at any point (let alone when they entered into the conspiracy) of his Maryland residency or of Mirda's journeys to Maryland in connection with the alleged scheme.[10] Alam's failure to allege these facts dooms his attempt to establish personal jurisdiction over Talukder, Mia, and Shah under the conspiracy theory of jurisdiction. *See, e.g.*, *Gold v. Gold*, No. JKB-17-483, 2017 WL 2061480, at *3 (D. Md. May 15, 2017) (dismissing claims for lack of personal jurisdiction based on a conspiracy theory of jurisdiction because plaintiff failed to "allege when the [d]efendants formed their alleged agreement to defraud him" and when a co-conspirator "became aware of" Maryland-based activity that might subject her to personal jurisdiction in the state).

Resisting this conclusion, Alam largely restates or attempts to reformulate the allegations in his complaint. For instance, Alam says he alleges in his complaint that Akhand and Talukder "were in regular contact" with him "concerning this investment and their gas station scheme," but the complaint paragraphs he cites allege no such thing. *Compare* ECF 18-1, at 10, *with* ECF 5, at 5–6. Alam also contends that Mia and Shah, at least, should reasonably have known that he was in Maryland, because (1) as previously discussed, one of the checks that Alam gave Mirda was made out to BD International Inc., of which Mia was owner and CEO; and (2) the "Court may take judicial notice" that the K-1 forms prepared by Shah, which Alam allegedly received in the mail in 2024, "would have been addressed to . . . Alam in Hyattsville, Maryland." ECF 18-1, at 10. Neither claim, however, is persuasive.

---

[10] In Count II of his complaint (civil conspiracy), Alam alleges that the defendants "were involved in" the conspiracy "from August of 2022 onward," but does not clearly state that they formed any agreement at that time. *See* ECF 5, at 11. Even if the Court were to construe Alam's complaint as alleging that the defendants formed their agreement in August 2022, however, his failure to specify when (or if) Talukder, Mia, and Shah knew of his Maryland residency or of Mirda's travels to Maryland would still defeat his attempt to establish conspiracy jurisdiction.

As to the first argument, even assuming the check contained Alam's Hyattsville address, that fact would not establish that Mia was aware of Alam's residency at the time he entered into the alleged conspiracy. As to the second argument, it is unclear what Alam means. If he means that the *package* containing the K-1 forms logically would have been addressed to his Hyattsville residence, that would not suggest that Shah (or any other defendant aside from Mirda) knew his address, because Alam alleges that Mirda is the one who sent this package. If Alam means that the *forms themselves* would have contained his Maryland address, this "fact" is not subject to judicial notice. "[A] 'judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *United States v. Fowler*, 58 F.4th 142, 152 (4th Cir. 2023) (quoting *Colonial Penn. Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989)) (alteration in *Coil*). Alam identifies no source whatsoever for his assertion that the forms would have contained his address. The Court will not speculate what information the forms contained, especially because, by Alam's own allegations, the K-1 forms were "incomplete." *See* ECF 5, at 9. And even if the Court were to assume that the K-1 forms contained Alam's address, or that Shah saw the mailing that Mirda sent, those facts do not indicate what Shah knew about Alam's Maryland residency when he entered into the alleged conspiracy.

The Court lacks personal jurisdiction over Talukder, Mia, and Shah. Alam's claims against those defendants are dismissed without prejudice.

### III.    Motion to Dismiss for Failure to State a Claim

Mirda further moves to dismiss all Alam's claims against him for failure to state a claim. Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021)

(quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

## A. Breach of Contract Claim (Count I)

Mirda argues that Alam fails to state a claim for breach of contract because he "fails to demonstrate any enforceable or plausible contractual obligation beyond a vague, unenforceable opinion about potential future investment performance" and because "[t]here are no plausible facts demonstrating that . . . Mirda's alleged representations were contractual in nature, intended to assent to a contract, or sufficient to bind . . . Mirda individually to any promise." ECF 14-1, at 22. The Court disagrees.

"To state a claim for breach of contract" under Maryland law, "a plaintiff must allege sufficient factual content for a court to infer that (a) the defendant was under a contractual obligation owed to the plaintiff, which (b) the defendant breached." *John v. Essentia Ins. Co.*, 708 F. Supp. 3d 694, 699 (D. Md. 2023) (citing *Yousef v. Trustbank Sav., F.S.B.*, 568 A.2d 1134, 1137 (Md. Ct. Spec. App. 1990)). "A contract is formed when an unrevoked offer made by one person is accepted by another," and "may be oral or written, as well as express or implied." *Transamerica Premier Life Ins. Co. v. Selman & Co., LLC*, 401 F. Supp. 3d 576, 591 (D. Md. 2019) (quoting *Cnty. Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc.*, 941 A.2d 1181, 1209 (Md. Ct. Spec. App. 2008)). The agreement also must be "definite in its terms" and accompanied by "sufficient consideration." *Montage Furniture Servs., LLC v. Regency Furniture, Inc.*, 966 F. Supp. 2d 519,

524 (D. Md. 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004)).

Alam alleges that Mirda made several promises. He alleges that Mirda promised him that if he gave him $150,000, Mirda would invest that money in the five gas stations. He alleges that Mirda promised to personally guarantee his investment and assume responsibility for any monetary loss. And he alleges that Mirda promised to pay him between $12,000 and $14,000 per month if he worked for one or more of the gas stations. Alam alleges that he accepted Mirda's offer by paying $150,000 and working for the defendants. Alam also alleges that Mirda breached each promise: that he failed to invest all his money in the gas stations; that he did not reimburse him for his lost money; and that he did not compensate him for his work. These allegations suffice to state a breach of contract claim. The Court need not decide now whether, had Mirda invested the $150,000 as promised, his assurances of future profits would constitute enforceable promises. Even if they would not, Alam sufficiently alleges the existence of an enforceable contract and Mirda's breach of that contract on other grounds.

Count I may proceed against Mirda.

**B. Civil Conspiracy Claim (Count II)**

Alam alleges that Mirda is liable for civil conspiracy. A plaintiff may prevail on a civil conspiracy claim by showing (1) "[a] confederation of two or more persons by agreement or understanding;" (2) "some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and" (3) "[a]ctual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007).

As discussed in part II.B of this opinion, Alam plausibly alleges that Mirda entered into an agreement with the other moving defendants to defraud him of his money. For the reasons set forth

in part III.E, Alam plausibly alleges that Mirda engaged in fraudulent conduct in furtherance of this conspiracy by making various false representations to induce Alam to invest. And Alam plausibly alleges that he has been damaged because he has lost his life savings. Therefore, Alam plausibly alleges civil conspiracy.

Count II may proceed against Mirda.

### C. Accounting, Declaratory Judgment, and Piercing the Corporate Veil Claims (Counts III–V)

In Counts III through V, Alam asserts claims for accounting, declaratory judgment, and piercing the corporate veil. These claims must be dismissed because they do not constitute independent causes of action. *See, e.g.*, *Orteck Int'l, Inc. v. Transpacific Tire Wheel, Inc.*, 704 F. Supp. 2d 499, 521 (D. Md. 2010) ("an accounting [is a] remed[y], not [an] independent cause[ ] of action"), *aff'd*, 457 F. App'x 256 (4th Cir. 2011); *Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 752 n.6 (D. Md. 2020) ("The Declaratory Judgment Act 'provides a remedy in cases otherwise in the [c]ourt's jurisdiction; it does not create an independent cause of action.'") (quoting *Elec. Motor & Contracting Co. v. Travelers Indem. Co. of Am.*, 253 F. Supp. 3d 781, 793 (E.D. Va. 2017)), *appeal dismissed*, No. 20-1438, 2020 WL 6042036 (4th Cir. May 28, 2020); *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 514 (D. Md. 2013) ("piercing the corporate veil is not an independent cause of action, 'but rather is a means of imposing liability on an underlying cause of action'") (quoting *Peacock v. Thomas*, 516 U.S. 349, 354 (1996)).

Counts III, IV, and V are dismissed with prejudice.

### D. Breach of Fiduciary Duty Claim as to Mirda (Count VI)

Alam alleges that Mirda is liable for breach of fiduciary duty because, as owner and CEO of BD S & T, Inc., he owed Alam "a fiduciary duty . . . to ensure that the company was properly run and managed and that its funds were proper[l]y spent," which he breached by failing to

"properly compensate" Alam, failing to keep adequate records, and "improperly appropriat[ing]" corporate funds "which properly belonged to [Alam]." ECF 5, at 16. Mirda argues that this claim should be dismissed for failure to state a claim. The Court disagrees.

The parties cite cases applying Maryland law in support of their arguments. However, under Maryland's choice-of-law rules—which this Court must follow when sitting in diversity, *see, e.g.*, *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013)—"Maryland courts apply the law of the state of incorporation" to claims for breach of fiduciary duty involving "matter[s] peculiar to the relationships among and between [a] corporation and its directors," *De Simone v. VSL Pharms., Inc.*, 133 F. Supp. 3d 776, 794 (D. Md. 2015) (quoting *Storetrax.com, Inc. v. Gurland*, 895 A.2d 355, 372 (Md. Ct. Spec. App. 2006), *aff'd*, 915 A.2d 991 (Md. 2007)). BD S & T, Inc. is incorporated in West Virginia, so West Virginia law applies to Alam's breach of fiduciary duty claim. In West Virginia, "[t]he elements for a breach of fiduciary duty claim, while not definitive, have been observed to include: (1) the existence of a fiduciary relationship; (2) breach of this relationship; and (3) damages proximately caused by that breach." *Moore v. Jordan*, C/A No. 5:24-CV-196, 2025 WL 3772676, at *4 (N.D. W. Va. Aug. 25, 2025) (citing *State ex rel. Affiliated Constr. Trades Found. v. Vieweg*, 520 S.E.2d 854, 868 (W. Va. 1999) (Workman, J., concurring)).

Mirda first argues that because this claim "sound[s] in fraud," it must comply with the heightened pleading requirements of Rule 9(b), and that Mirda's failure to plead his allegations of breach of fiduciary duty with the particularity required by Rule 9(b) dooms his claim. ECF 14-1, at 17. The Court rejects the premise. Fraudulent conduct is not a required element of a breach of fiduciary duty claim under West Virginia law. *See, e.g.*, *Miner v. Berland*, C/A No. 5:08CV127, 2010 WL 1369135, at *3 (N.D. W. Va. Mar. 31, 2010) ("The defendant makes the argument that

23

a defendant's conduct must be proven to be deceitful or fraudulent [to sustain a claim for breach of fiduciary duty]. The defendant's requested definition of a fiduciary duty finds no support in West Virginia case law.") Moreover, Alam makes no allegations, in connection with Count VI, that Mirda made any false representations that would amount to fraud. The Court will thus apply the more relaxed Rule 8 pleading standard to this claim.

Mirda argues that "the sole basis for [Alam's] fiduciary duty claims are . . . alleged pre-investment representations," that Alam makes no "allegations demonstrating . . . fiduciary breach" apart from "boilerplate allegations of mismanagement," and that Alam's "mere regret in his investment and subsequent loss of same, standing alone, is not grounds for stating any legal claim, including for breach of fiduciary duty." ECF 14-1, at 19. Mirda mischaracterizes Alam's allegations. Alam alleges that he gave Mirda $150,000 to purchase a ten percent interest in a corporation of which Mirda was owner and CEO; that his money was not invested as promised, causing a loss of $150,000; and that he has been provided incomplete tax documents and denied the opportunity to inspect other corporate records for BD S & T, Inc. As to these allegations, Mirda offers no argument why they fail to state a claim for breach of fiduciary duty under West Virginia law. The Court will not make those arguments on Mirda's behalf. *See, e.g.*, *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020) ("as a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief'") (alteration in *Sineneng-Smith*) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in judgment)).

Because Mirda offers no basis for dismissal, Count VI may proceed against him.

### E.  Fraud Claim (Count VIII)

Alam claims that Mirda is liable for fraud because Mirda made false promises that the defendants "could and would provide [Alam] with certain wage compensation, interest, dividends, distributions, and other contributions," and that Mirda knew that the defendants "could not and would not provide the promised financial benefits and returns to [Alam]." ECF 5, at 18. Mirda argues that Alam fails to plead this claim with the requisite particularity and that, even if he did, he otherwise fails to sufficiently allege fraud. The Court disagrees.

Under Maryland law, the elements of a fraud claim are

> (1) that the defendant made a false representation to the plaintiff; (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Bennett v. Ashcraft & Gerel, LLP*, 303 A.3d 1237, 1266 (Md. App. Ct. 2023) (citing *Sass v. Andrew*, 832 A.2d 247, 260 (Md. Ct. Spec. App. 2003)), *cert. denied*, 306 A.3d 652 (Md. 2023), *and cert. denied*, 314 A.3d 346 (Md. 2024). Rule 9(b) imposes a "heightened pleading standard" on fraud plaintiffs by "requir[ing] that 'a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 196 (4th Cir. 2018) (quoting Fed. R. Civ. P. 9(b)). These circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). In other words, "a plaintiff must allege facts establishing the 'who, what, when, where, and how' of the claimed fraud." *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 625 (D. Md. 2012) (quoting *United States ex rel. Wilson v. Kellogg Brown*

& *Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008)). "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison*, 176 F.3d at 783 n.5. "Rule 9(b)'s heightened pleading standard applies to state law fraud claims asserted in federal court." *United States ex rel. Palmieri v. Alpharma, Inc.*, 928 F. Supp. 2d 840, 853 (D. Md. 2013) (quoting *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009)).

Alam's allegations of fraud satisfy Rule 9(b)'s standard. Alam alleges that Mirda contacted him in Maryland and made various factual representations (including that his money would be invested, that Mirda would guarantee this investment, and that Alam and his wife could be employed by the gas stations and earn wages) over a period of several weeks between mid-August and September 24, 2022. Although Alam does not specify the precise dates and times of each communication within this time frame, "Rule 9(b) does not require 'the exact date and time of each . . . misrepresentation[.]'" *ISP Techs., Inc. v. Capricorn Pharma., Inc.*, No. WDQ-11-23, 2011 WL 2600674, at *6 n.8 (D. Md. June 28, 2011) (first alteration in *ISP*) (quoting *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 738 (E.D. Va. 2010)); *see also Wiseman v. First Mariner Bank*, No. ELH-12-2423, 2013 WL 5375248, at *15 (D. Md. Sept. 23, 2013) (explaining that "a complaint 'need not plead precise dates and times of alleged misrepresentations' to comply with Rule 9(b)" and that "a complaint is sufficiently specific to meet the Rule 9(b) bar when it provides dates 'or some other measure of precision and substantiation' of the particulars of the fraud alleged") (quoting *Petrakopoulou v. DHR Int'l, Inc.*, 626 F. Supp. 2d 866, 870 (N.D. Ill. 2009) and *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 751 (D.N.J. 2013)). Alam also alleges that, by making these alleged misrepresentations, Mirda secured a $150,000 payment and Alam's labor. Alam has specified "the time, place, and contents of the false representations, as well as the identity

of the person making the misrepresentation and what he obtained thereby." *Weidman*, 776 F.3d at 219 (quoting *Harrison*, 176 F.3d at 784).

Mirda argues that, even if Alam's fraud claim is pled with the requisite particularity, he still fails to state a claim because "the entire basis for the [c]omplaint appears to be a handful of comments" by Mirda "purporting to assure [Alam] that his investment in certain West Virginia gas station corporations would result in positive future earnings/return," and these statements "cannot constitute actionable fraud" because they were "not 'susceptible of exact knowledge at the time [they were] made[.]'" ECF 14-1, at 18 (quoting *Layton v. AAMCO Transmissions, Inc.*, 717 F. Supp. 368, 371 (D. Md. 1989)) (first alteration in *Layton*). Again, the Court disagrees. Alam alleges that Mirda made at least three false representations: that his $150,000 payment would be invested in the gas station companies; that Mirda would personally guarantee his investment; and that Alam would be compensated for work he performed for the gas stations. Alam alleges that he relied on these representations in paying Mirda $150,000 and performing work for the defendants, and the Court can plausibly infer that his reliance on those representations was justified. Alam alleges that he suffered compensable injury to the tune of his life savings plus unpaid wages. And Alam alleges that Mirda knew that he "could not and would not provide the promised financial benefits" to him and intended to defraud him, *see* ECF 5, at 18, which suffices at the pleading stage, *see* Fed. R. Civ. P. 9(b) (in fraud claims, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

Count VIII may proceed against Mirda.

### F. Unjust Enrichment Claim (Count IX)

Alam alleges that Mirda is liable for unjust enrichment because Alam provided him $150,000 and "performed work and personal services" for the defendants, and it would be

inequitable for Mirda to retain the value of those funds and services without compensating Alam. *Id.* at 19. Mirda argues that these allegations fail to state a claim. The Court disagrees.

To state a claim for unjust enrichment under Maryland law, the plaintiff must allege: (1) "[a] benefit conferred upon the defendant by the plaintiff;" (2) "[a]n appreciation or knowledge by the defendant of the benefit; and" (3) "[t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (quoting *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000)).

Alam states a claim for unjust enrichment. He alleges a benefit: payment of $150,000, at least part of which Mirda retained for his own personal use. And the Court readily can infer that Mirda was aware of the value of this benefit; after all, he was the one who originally made the investment proposal and accepted Alam's checks. Alam also alleges that Mirda's retention of the benefit would be inequitable. As discussed above, Alam plausibly alleges that Mirda procured this payment through fraudulent conduct. *See Lacks v. Ultragenyx Pharm., Inc.*, 734 F. Supp. 3d 397, 444 (D. Md. 2024) ("Maryland law expressly recognizes that it is prima facie inequitable to retain a benefit originating in tortious wrongdoing") (citing *Bank of Am. Corp. v. Gibbons*, 918 A.2d 565, 569 (Md. Ct. Spec. App. 2007)). These allegations suffice to state a claim of unjust enrichment.

Mirda offers two counterarguments. First, he argues that Alam fails to state an unjust enrichment claim because Alam's allegations show that "[Alam] never intended to confer an individual benefit on any of the [m]oving [d]efendants"; rather, he made the $150,000 payment in order to purchase "equity in a corporation[.]" ECF 14-1, at 21. But Mirda cites no authority for the proposition that an unjust enrichment claim requires that the plaintiff have *intended* to benefit the defendant. Indeed, the Restatement (Third) of Restitution and Unjust Enrichment ("Restatement

28

(Third)")—to which "Maryland courts look . . . in assessing unjust enrichment claims," *Lacks*, 734 F. Supp. 3d at 420—recognizes that an unjust enrichment claim can arise even when the plaintiff lacks contemporaneous knowledge of the benefit, *see, e.g.*, Restatement (Third) § 44 cmt. B, illus. 11 (illustrating unjust enrichment liability through example of doctor who retains patient's blood samples and sells them at a profit "[w]ithout request or disclosure to [the] [p]atient").

Second, Mirda urges that, for purposes of an unjust enrichment claim, the purchase of equity in a corporation does not "confer[ ] a benefit on individual [corporate] officers." ECF 14-1, at 21 (emphasis omitted). This position has some support in the law. The Fourth Circuit has recognized that, when a benefit is conferred on a corporate officer and shareholder in their capacity as a shareholder, and when the plaintiff offers no basis for piercing the corporate veil, the officer cannot be held liable for unjust enrichment in their individual capacity. *See, e.g.*, *Johnson v. Ross*, 419 F. App'x 357, 362 (4th Cir. 2011). The key question, then, is whether Alam alleges sufficient facts that would justify piercing the corporate veil and holding Mirda individually liable. Because all five of the corporations in which Alam sought to invest are incorporated in West Virginia, West Virginia law governs the question of whether their veils may be pierced. *See Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 386 (4th Cir. 2018) ("The law of the state in which an entity is incorporated generally governs the question whether a court may pierce an entity's veil.").

"West Virginia law recognizes that '[u]nder exceptional circumstances, . . . . [j]ustice may require that courts look beyond the bare legal relationship of the parties to prevent the corporate form from being used to perpetrate injustice, defeat public convenience, or justify wrong.'" *Johnson*, 419 F. App'x at 363 (alterations in *Johnson*) (quoting *Laya v. Erin Homes, Inc.*, 352 S.E.2d 93, 97 (W. Va. 1986)). Whether to pierce the corporate veil is a fact-intensive question that "should rarely be determined upon a motion for summary judgment"; rather, "[d]ecisions to look

beyond, inside and through corporate facades must be made case-by-case, with particular attention to factual details." *Id.* (quoting *Laya*, 352 S.E.2d at 102, and *S. Elec. Supply Co. v. Raleigh Cnty. Nat'l Bank*, 320 S.E.2d 515, 523 (W. Va. 1984)). Under West Virginia law, "in a case involving an alleged breach of contract," piercing the corporate veil to hold a shareholder individually liable requires a showing that "(1) there [is] such unity of interest and ownership that the separate personalities of the corporation and the individual shareholder(s) no longer exist . . . and (2) an inequitable result would occur if the acts are treated as those of the corporation alone[.]" *Laya*, 352 S.E.2d at 99. The Supreme Court of Appeals of West Virginia has set forth 19 non-exclusive factors for determining whether this test is satisfied:

> (1) [C]ommingling of funds and other assets of the corporation with those of the individual shareholders; (2) diversion of the corporation's funds or assets to noncorporate uses (to the personal uses of the corporation's shareholders); (3) failure to maintain the corporate formalities necessary for the issuance of or subscription to the corporation's stock, such as formal approval of the stock issue by the board of directors; (4) an individual shareholder representing to persons outside the corporation that he or she is personally liable for the debts or other obligations of the corporation; (5) failure to maintain corporate minutes or adequate corporate records; (6) identical equitable ownership in two entities; (7) identity of the directors and officers of two entities who are responsible for supervision and management (a partnership or sole proprietorship and a corporation owned and managed by the same parties); (8) failure to adequately capitalize a corporation for the reasonable risks of the corporate undertaking; (9) absence of separately held corporate assets; (10 use of a corporation as a mere shell or conduit to operate a single venture or some particular aspect of the business of an individual or another corporation; (11) sole ownership of all the stock by one individual or members of a single family; (12) use of the same office or business location by the corporation and its individual shareholder(s); (13) employment of the same employees or attorney by the corporation and its shareholder(s); (14) concealment or misrepresentation of the identity of the ownership, management or financial interests in the corporation, and concealment of personal business activities of the shareholders . . .; (15) disregard of legal formalities and failure to maintain proper arm's length relationships among related entities; (16) use of a corporate entity as a conduit to procure labor, services or merchandise for another person or entity; (17) diversion of corporate assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors, or the manipulation of assets and liabilities between entities to concentrate the assets in one and the liabilities in another; (18) contracting by the corporation with another person with the intent to

> avoid the risk of nonperformance by use of the corporate entity; or the use of a corporation as a subterfuge for illegal transactions; (19) the formation and use of the corporation to assume the existing liabilities of another person or entity.

*Id.* at 98–99. In short, a court must look to the "totality of the circumstances" in determining whether the corporate veil should be pierced in a contract claim. *Id.* at 99. *Laya*'s application is not limited to breach of contract claims. The Fourth Circuit has applied *Laya* to claims that sound in quasi-contract, such as unjust enrichment. *See Johnson*, 419 F. App'x at 364.

Here, Alam alleges sufficient facts to support piercing the corporate veil and holding Mirda individually liable. Alam alleges that Mirda diverted his $150,000 payment to two of the five corporations for his and the other defendants' personal uses. Alam also alleges that Mirda sent him only one year's worth of incomplete K-1 forms when he requested far more records, and ignored Alam's requests to inspect various corporate documents. From these allegations, the Court can plausibly infer that there was a failure to maintain adequate corporate records for the five corporations. The Court thus will not hold, on a Rule 12(b)(6) motion, that the corporate veil shields Mirda from personal liability.

Count IX may proceed against Mirda.

### G. Promissory Estoppel Claim (Count X)

Alam alleges that Mirda is liable for promissory estoppel because Mirda promised that he would receive "wage compensation, interest, dividends, distributions, principal repayment, and other contributions with a total value far in excess of" his $150,000 payment, and that Alam relied on this promise to his detriment by paying him $150,000 and performing services for him. ECF 5, at 20. Mirda argues that Alam fails to state a claim. The Court disagrees.

A claim for promissory estoppel under Maryland law requires the plaintiff to allege:

> (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the

promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by enforcement of the promise.

*Pavel Enters. v. A.S. Johnson Co.*, 674 A.2d 521, 532 (Md. 1996).

Mirda argues that Alam has not pled a promissory estoppel claim because "allegations or promises of positive future investment returns standing alone" are not a sufficiently "clear and definite promise" "to induce justifiable reliance[.]" ECF 14-1, at 20 (internal quotation marks omitted). But once again, this argument oversimplifies Alam's allegations. Alam plausibly alleges that Mirda promised to invest his $150,000, personally guarantee his investment, and pay him wage compensation if he worked for the West Virginia gas stations; that, in reliance on these promises, Alam gave Mirda $150,000 and worked for him; and that Mirda did not hold up his end of the bargain. The Court can plausibly infer that Mirda reasonably expected his promise to "induce action or forbearance" on Alam's part, since—according to Alam's allegations—Mirda made these promises to induce him to invest. And Alam alleges that Mirda's actions have caused Alam to lose his life savings and compensation for his labor. These are detriments that can be avoided only by enforcement of the alleged promise. Alam states a claim for promissory estoppel.

Count X may proceed against Mirda.

### H. MCPA Claim (Count XI)

Alam alleges that Mirda is liable under the MCPA. The MCPA was enacted to "set certain minimum standards for the protection of consumers" in Maryland. *Wheeling v. Selene Fin. LP*, 250 A.3d 197, 215 (Md. 2021) (quoting Com. Law § 13-102(b)(1)). Mirda argues that Alam fails to plausibly allege an MCPA violation because he is not a "consumer" within the meaning of the statute. In his opposition, Alam concedes that this claim should be dismissed and offers no substantive argument in response to Mirda's contentions. Alam has thus abandoned his MCPA

claim, and the Court will dismiss this claim with prejudice. *See, e.g.*, *Yarmohammadi v. Rubio*, No. BAH-24-2952, 2025 WL 2043719, at *7 (D. Md. Jul. 21, 2025) (dismissing claim with prejudice because the plaintiffs' opposition to the defendants' motion to dismiss did not counter the defendants' argument for dismissal of the claim, and "thus . . . [the plaintiffs] have abandoned this claim").[11]

Count XI is dismissed with prejudice.[12]

## IV.    Conclusion

The moving defendants' motion to dismiss is granted in part and denied in part. A separate Order follows.

Date: January 30, 2026

_____
Deborah L. Boardman
United States District Judge

---

[11] Even if Alam had not abandoned this claim, it would be subject to dismissal. Those who are not "consumers," as defined in the MCPA, cannot bring suit under the statute. *See, e.g.*, *Mian v. Gen. Manager, Balt.-Wash. Manheim Auction*, No. TDC-14-2534, 2015 WL 3369366, at *3 (D. Md. May 22, 2015), *aff'd*, 645 F. App'x 233 (4th Cir. 2016). The MCPA defines "consumer" as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit," Com. Law § 13-101(c)(1), which are in turn defined as "credit, debts or obligations, goods, real property, and services which are primarily for personal, household, family, or agricultural purposes," *id.* § 13-101(d)(1). Alam does not allege that he purchased, leased, or received from Mirda any "credit, debts or obligations, goods, real property, [or] services" that were "primarily for personal, household, family, or agricultural purposes." He thus fails to state a claim under the MCPA because he fails to plausibly allege that he is a "consumer."

[12] Because Alam only asserts Count VII (breach of fiduciary duty) against Mia, and the Court lacks personal jurisdiction over Mia, Count VII is dismissed without prejudice in its entirety pursuant to Rule 12(b)(2), and the Court does not consider whether Count VII would survive a Rule 12(b)(6) analysis.